## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JEROME MAJOR, Individually and as the projected Independent Executor of the Estate of COLLEEN MAJOR, deceased,<br><br>        Plaintiff<br><br>    v.<br><br>COLOPLAST CORPORATION, COLOPLAST A/S, COLOPLAST MANUFACTURING US, LLC, MENTOR WORLDWIDE, LLC and ANALYTIC BIOSURGICAL SOLUTIONS,<br><br>        Defendant. | Case No. |

## COMPLAINT

Plaintiff, Jerome Major, Individually and as the projected Independent Executor of the Estate of Colleen Major, deceased, (collectively "Plaintiff"), by and through its undersigned attorney, hereby files his causes of action against Defendants Coloplast Corporation ("Coloplast"), Coloplast A/S ("Coloplast A/S"), Coloplast Manufacturing US, LLC ("Coloplast Manufacturing"), Mentor Worldwide, LLC ("Mentor) and Analytic Biosurgical Solutions ("ABISS") and alleges as follows:

## GENERAL ALLEGATIONS

1.      This is an action to recover damages arising from personal injuries suffered by Colleen Major, deceased, who was treated with the medical device Aris Trans-Obturator Tape (the "Product"), as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendants.

**PARTIES**

2.      Plaintiff Jerome Major, the surviving spouse of Colleen Major, deceased, is a competent adult and a resident and citizen of the State of Illinois, County of Lake.  At the time this cause of action arose and at the time of his wife's death, Plaintiff Jerome Major was married to Colleen Major.

3.      Plaintiff Jerome Major is in the process of being named the Independent Executor of the Estate of Colleen Major, deceased.

4.      Defendant Coloplast Corp. ("Coloplast Corp.") is a corporation organized and existing under the laws of the State of Delaware, maintaining its principal place of business and citizenship at 1601 West River Road North, Minneapolis, Minnesota 55411.   Coloplast Corp. is a wholly-owned U.S. sales and marketing subsidiary of Coloplast A/S, a Denmark corporation. Coloplast Corporation moved its North American headquarters to Minneapolis in June 2006.

5.      Defendant Coloplast A/S is a corporation organized and existing under the laws of the Kingdom of Denmark maintaining its principal place of business and citizenship at Holtedam 1, Humlebaek 3050, Kingdom of Denmark and maintaining its North American principal place of business and citizenship at 1601 West River Road North, Minneapolis, Minnesota 55411. Coloplast A/S moved its North American headquarters to Minneapolis in June 2006.  From 1990 to June 2006, Coloplast A/S maintained its North American headquarters in Marietta, Georgia.

6.      Defendant Coloplast Manufacturing US is a limited liability corporation organized and existing under Delaware law maintaining its principal place of business as 1940 Commerce Drive, North Mankato, MN 56002.  Coloplast Manufacturing US, LLC's registered office is 5600 Park Street, #6, St. Paul, Minnesota 55103.  Coloplast Manufacturing US, LLC is

a wholly-owned subsidiary of Coloplast Corp. The sole member of Coloplast Manufacturing US, LLC is Coloplast Corp.

7.    Coloplast Corp., Coloplast A/S, and Coloplast Manufacturing US, LLC, are collectively referred to herein as "Coloplast."

8.    Defendant Mentor Worldwide LLC ("Mentor Worldwide") is a limited liability corporation, incorporated in Delaware, with a location at 1209 Orange Street, Wilmington, DE 19801, with a principal place of business at 5425 Hollister Avenue, Santa Barbara, CA 93111. The citizenship of a limited liability company (LLC) is determined by the citizenship of each of its members for purposes of diversity.  *See, e.g.*, *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412 (3d Cir. 2010).  Mentor Worldwide's sole member is Ethicon, Inc. Ethicon, Inc. is a wholly owned subsidiary of Johnson & Johnson and has its citizenship in Somerville, New Jersey.

9.    Defendant Analytic Biosurgical Solutions ("ABISS") is a corporation organized and existing under the laws of the Republic of France maintaining its principal place of business and citizenship at 14 Rue de la Telematique, St. Etienne, Loire 42000, Republic of France. ABISS' registered United States Food and Drug Administration ("FDA") Agent is Elizabeth A. Boots, residing at 6106 Shamrock Drive, Maddison Lake, Minnesota, 56063-9525.  Ms. Boots is Vice President, Quality Assurance, of Defendant Coloplast and her office is located at 1601 West River Road, Minneapolis, Minnesota.

10.    At all relevant times, Defendants were in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, advertising, and delivering, and introducing into interstate commerce, including, *inter alia*, within the United States, either

directly or indirectly through third parties, subsidiaries or related entities, pelvic mesh products, including the Product.

11.     All acts and omissions of the above-referenced Defendants as described herein were done by its agents, servants, employees, and/or owners, acting in the course and scope of their respective agencies, services, employments, and/or ownership.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff alleges that the amount in controversy exceeds seventy-five thousand one dollars ($75,001.00), exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and Defendants.

13.     Venue in this Court is proper in this action pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to Plaintiff's claims occurred, in part, in the Northern District of Illinois.

## FACTUAL BACKGROUND

14.     At all times material to this action, Defendants designed, developed, manufactured, tested, packaged, advertised, promoted, marketed, distributed, labeled, and/or sold a line of women's pelvic mesh products, including the Aris Trans-Obturator Tape (the "Product").

15.     At all relevant times, the Product was used to treat stress urinary incontinence (SUI).

16.     Stress urinary incontinence is a type of incontinence characterized by leakage of urine during moments of physical stress.

17.     Defendants also sell pelvic mesh products that are used to treat pelvic organ prolapse (POP). A pelvic organ prolapse occurs when a pelvic organ, such as the bladder, drops

- 4 -

("prolapses") from its normal position and pushes against the walls of the vagina. Prolapse can happen if the muscles that hold the pelvic organs in place become weak or stretched from childbirth or surgery. More than one pelvic organ can prolapse at the same time. Organs that can be involved in a pelvic organ prolapse include the bladder, the uterus, the bowel and the rectum.

18.     Surgical mesh, including mesh used in the Product and in Defendants' other pelvic mesh products, is a medical device that is generally used to repair weakened or damaged tissue. It is made from porous absorbable or non-absorbable synthetic material or absorbable biologic material. In urogynecologic procedures, surgical mesh is permanently implanted to reinforce the weakened vaginal wall to support the urethra to treat urinary incontinence or to repair pelvic organ prolapse. The Product is comprised of non-absorbable, synthetic, monofilament polypropylene mesh.

19.     Despite claims that polypropylene mesh is inert, the scientific evidence shows that this material as implanted in Colleen Major, deceased, is biologically incompatible with human tissue, and when used as a woven or knitted alloplastic textile prosthetic mesh for pelvic floor repair, polypropylene and other surgical polymers promote a severe foreign body reaction and chronic inflammatory response in a large subset of the population implanted with Defendants' pelvic mesh products. This "host defense response" by a woman's pelvic tissues promotes degradation of the polypropylene mesh and the pelvic tissue, and causes chronic inflammation of the pelvic tissue, shrinkage or contraction of the mesh leading to nerve entrapment, further inflammation, chronic infectious response and chronic pain. It also can cause new-onset painful sexual relations, significant urinary dysfunction, vaginal shortening and anatomic deformation, and can contribute to the formation of severe adverse reactions to the mesh.

1587387.4

20.    When the Product is inserted in the female body according to the manufacturers' instructions, it creates a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities.

21.    In 1996, the FDA cleared the first pelvic mesh products for use in the treatment of stress urinary incontinence (SUI).  These products include products manufactured, marketed, and distributed by Defendants.  These products are approved by the FDA under the abbreviated 510(k) approval process.  Section 510(k) provides for marketing of a medical device if the device is deemed "substantially equivalent" to other predicate devices marketed before May 28, 1976.  No formal review for safety or efficacy is required, and no formal review for safety or efficacy was ever conducted with regard to the Product or any of Defendants' pelvic mesh products.

22.    In May 2005, Mentor announced the U.S. launch of its new Aris Trans-Obturator Tape.  According to Mentor's launch reports, "specifically designed to utilize Mentor's patented Trans-Obturator Technique (T.O.T.(™)), Aris represents the newest technical achievement and advanced generation of trans-obturator slings for the treatment of stress urinary incontinence in women." "The introduction of Aris furthers Mentor's position as a pioneer of the trans-obturator method for treating stress incontinence in women," commented Joshua H. Levine, President and Chief Executive Officer of Mentor Corporation. "We are committed to driving innovation in the field of women's health to provide better solutions for physicians and the patients they serve."

23.    Analytic Biosurgical Solutions ("ABISS") FDA registration lists its proprietary device as "Mentor Aris Trans-Obturator Tape and Surgical Kit."

24.    On October 12, 2005, ABISS and Mentor entered into a number of agreements pursuant to which ABISS licensed a number of ABISS' products to Mentor, which were thereafter marketed by Mentor under its trademarks, including its Aris trademark.  On June 2,

- 6 -

2006, Mentor sold its surgical, urological, clinical and consumer healthcare business segments to Coloplast for $461,145,398, including *inter alia*, Mentor's October 12, 2005 agreements with ABISS and Mentor's Aris and Novasilk Pelvic Mesh Products.

25.     At all times, the product marketed and sold in the United States as "Mentor Aris Trans-Obturator Tape and Surgical Kit" was manufactured by ABISS and, at all times after October 2, 2006, the product "Mentor Aris Trans-Obturator Tape and Surgical Kit" was exclusively marketed and sold in the United States by Coloplast Corp. from its principal place of business in Minneapolis, Minnesota.

26.     ABISS is registered with the FDA, Registration Number 3004756681, as the manufacturer of "Mentor Aris Trans-Obturator Tape and Surgical Kit."

27.     Coloplast Corp.'s annual report for 2009-2010 reported that "the majority of our acquired patents and trademarks are associated with the acquisition of Mentor's urology, business in 2006." The annual report also said that Mentor signed "a non-competition clause prohibiting Mentor (the seller) from selling urology products for the next seven years…."

28.     Coloplast A/S received 510(k) clearance for the Supris Retropubic Sling System 510(k) K111233 in June 2011, as a device substantially equivalent to the Mentor Aris Suprapubic Surgical Kit.

29.     On October 29, 2010, Coloplast Corp. acquired Mpathy Medical Devices, Inc. ("Mpathy"). Mpathy was founded in 2003, with the aim of developing less invasive surgical solutions for the treatment of female stress urinary incontinence and pelvic organ prolapse. Mpathy's core product lines included Minitape® and Omnisure® for stress urinary incontinence, and the Restorelle® family for pelvic organ prolapse. Defendant Coloplast Corp. said of the acquisition that Coloplast Corp.'s market position in Surgical Urology and Female Pelvic Health

would immediately strengthen based on Mpathy's product portfolio including slings, mini-slings and meshes for stress urinary incontinence and pelvic floor repair and material portfolio including Smartmesh® technology.

30.     Coloplast Corp.'s website describes its various products, including those for treating (i) "Pelvic Organ Prolapse" and (ii) "Stress Urinary Incontinence," including "Sling Procedures." A press release issued by Coloplast Corp. described Coloplast Corp.'s new corporate headquarters at 1601 West River Road in Minneapolis and stated that "Denmark-based Coloplast…selected north Minneapolis as the new home for its North American headquarters in 2006." According to the press release the new headquarters "will include one of the company's three global Innovation Centers."

31.     On July 13, 2011, the FDA issued a new warning regarding serious complications associated with pelvic mesh products, such as the products manufactured, marketed, and distributed by Defendants.  In this warning, the FDA indicated that "serious complications associated with surgical mesh for transvaginal repair of POP are **not rare**." (emphasis in the original).  The FDA had also received increased reports of complications associated with the pelvic mesh products used in both pelvic organ prolapse and stress urinary incontinence cases.

32.     The FDA Safety Communication also stated, "*Mesh contraction* (shrinkage) is a *previously unidentified risk* of transvaginal POP repair with mesh that has been reported in the published scientific literature and in adverse event reports to the FDA . . . Reports in the literature associate mesh contraction with vaginal shortening, vaginal tightening and vaginal pain." (emphasis in original).

33.     The FDA Safety Communication further indicated that the benefits of using pelvic mesh products instead of other feasible alternatives did not outweigh the associated risks.

Specifically, the FDA Safety Communication stated: "it is not clear that transvaginal POP repair with mesh is more effective than traditional non-mesh repair in all patients with POP and it may expose patients to greater risks."

34. Contemporaneously with the Safety Communication, the FDA released a publication titled "Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse" (the "White Paper"). In the White Paper, the FDA noted that published, peer-reviewed literature demonstrates that "[p]atients who undergo POP repair with mesh are subject to mesh-related complications that are not experienced by patients who undergo traditional surgery without mesh."

35. The FDA summarized its findings from its review of the adverse event reports and applicable literature stating that it "has NOT seen conclusive evidence that using transvaginally placed mesh in POP repair improves clinical outcomes any more than traditional POP repair that does not use mesh, and it may expose patients to greater risks." (Emphasis in original).

36. The White Paper further stated that "these products are associated with serious adverse events . . . Compounding the concerns regarding adverse events are performance data that fail to demonstrate improved clinical benefit over traditional non-mesh repair." In its White Paper, the FDA advises doctors to, inter alia, "[r]ecognize that in most cases POP can be treated successfully without mesh thus avoiding the risk of mesh related complications." The White Paper concludes by stating that the FDA "has identified serious safety and effectiveness concerns over the use of surgical mesh for the transvaginal repair of pelvic organ prolapse."

37. On August 25, 2011, Public Citizen, a consumer advocacy group, submitted a petition to the FDA seeking to ban the use of pelvic mesh products in pelvic repair procedures. In

its Petition, Public Citizen warned that pelvic mesh products should be recalled because they

offer no significant benefits, but expose patients to serious risks and the potential for permanent

life-altering harm. Joining Public Citizen as co-petitioners were Dr. L. Lewis Wall, a professor

of obstetrics and gynecology at Washington University in St. Louis, and Dr. Daniel S. Elliott, a

urologic surgeon specializing in female urology at the Mayo Clinic in Rochester, Minnesota.

38.     In a December 2011 Joint Committee Opinion, the American College of

Obstetricians and Gynecologists ("ACOG") and the American Urogynecologic Society

("AUGS") also identified physical and mechanical changes to the transvaginal mesh inside the

body as a serious complication associated with transvaginal mesh, stating:

> There are increasing reports of vaginal pain associated with changes that can occur with
> mesh (contraction, retraction, or shrinkage) that result in taut sections of mesh . . . Some
> of these women will require surgical intervention to correct the condition, and some of
> the pain appears to be intractable.

39.     The ACOG/AUGS Joint Committee Opinion also recommended, among other

things, that "[p]elvic organ prolapse vaginal mesh repair should be reserved for high-risk

individuals in whom the benefit of mesh placement may justify the risk."

40.     As is known to the Defendants, the risks associated with POP repair are the same

as SUI repair. However, the data regarding the magnitude and frequency of these known risks

are not as developed as the data on POP repair. The FDA recognized this, as demonstrated by its

Section 522 Orders issued to manufacturers of Pelvic Mesh Products used to treat SUI in January

of 2012.

41.     In September 2011, the FDA acknowledged the need for additional data and noted

in "Surgical Mesh For Treatment of Women with Pelvic Organ Prolapse and Stress Urinary

- 10 -

Incontinence" that the literature and information developing on SUI repair with Pelvic Mesh Products "indicate[] that serious complications can occur . . . [and] a case can be made for additional premarket and/or post market studies to better address the risk/benefit of all mesh products used for SUI."

42. Defendants did not, and have not, adequately studied the extent of the risks associated with the Product or any of their pelvic mesh products. In January 2012, the FDA recognized the risk to women and mandated additional studies to further investigate these risks.

43. Defendants knew or should have known that the Products unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks. At the time Defendants began marketing each of its pelvic mesh products, Defendants were aware that its pelvic mesh products were associated with each and every one of the adverse events communicated by the FDA in its July 13, 2011 safety communication.

44. The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code." "Material Fragmentation" is defined as an "[i]ssue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction."

45. Defendants make the following statements regarding the Product: "[Aris has] Low rate of particle release from the sling-**minimizes increase in inflammatory response.** Atraumatic, smooth edges allow for easy passage during implantation. Macroporous design allows for optimal tissue integration…".

46.     Contrary to Defendants' assertions that the Product minimizes increase in inflammatory response:

a.     In September of 2009, results from a study were published in the BMC Women's Health relating to the comparison of host response and complications in patients implanted with Coloplast's Aris. Implants from the Defendant's Aris group showed an increase risk of erosion which was quantified at 4%.  Kaelin-Gambirasio I, Complications associated with transobturator sling procedures: analysis obf 233 consecutive cases with a 27 months follow-up. BMC Womens Health. 2009 Sep 25;9:28.

b.     In September of 2012, results from a study were published in the World Journal of Urology relating to the comparison of TVT vs TOT slings. 15 of 71 patients suffered adverse events including infection and erosion, two thirds of which were implanted with Defendant's Aris. Wadie BS, TVT versus TOT, 2-year prospective randomized study. World J Urol. 2012 Sep 26.

47.     The Product was unreasonably susceptible to degradation and fragmentation inside the body; shrinkage or contraction inside the body; intense foreign body reaction; chronic inflammatory response; chronic wound healing; chronic infections in and around the mesh fibers; nerve entrapment in the collagen scar formation.  Defendants knew or should have known of these serious risks and should have, therefore, warned physicians and patients regarding these risks; to the extent they were known or knowable.

48.     To this day, the Product continues to be marketed to the medical community and to patients as safe, effective and reliable medical devices, implanted by safe, effective and minimally invasive surgical techniques, and as safer and more effective as compared to available

feasible alternative treatments of pelvic organ prolapse and stress urinary incontinence, and other competing products.

49.     Defendants omitted and downplayed the risks, dangers, defects, and disadvantages of the Product, and advertised, promoted, marketed, sold and distributed the Product as a safe medical device when Defendants knew or should have known that the Product was not safe for its intended purposes, and that the Product would cause, and did cause, serious medical problems, and in some patients, including Colleen Major, deceased, catastrophic injuries.  Further, while some of the problems associated with the Product were made known to physicians, the magnitude and frequency of these problems were not disclosed and were hidden from physicians.

50.     Contrary to Defendants' representations and marketing to the medical community and to the patients themselves, the Product has high rates of failure, injury, and complications, fails to perform as intended, requires frequent and often debilitating re-operations, and has caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Colleen Major, deceased, making it defective under the law.

51.     The specific nature of the Product's defects includes, but is not limited to, the following:

        a.     The use of polypropylene in the Product and the adverse tissue reactions and host defense response that result from such material, causing adverse reactions and serious, permanent injuries including, but not limited to, painful recurrent erosions and associated intractable pain;

        b.     The design of the Product to be inserted into and through an area of the body that is blood vessel rich, nerve dense, and bacteria laden leading to excessive blood loss

- 13 -

and vascular damage, permanent nerve injury and associated chronic, intractable neuropathic

pain, contaminated permanently-implanted mesh causing chronic infections, subclinical

infections and biofilms, enhanced chronic inflammatory response, chronic wound healing with

tissue destruction, as well as numerous other adverse reactions and serious and permanent

injuries;

    c.  Biomechanical issues with the design of the Product which result in a non-

anatomic condition leading to contraction or shrinkage of the mesh inside the body, that in turn

causes surrounding tissue to become eroded, inflamed, fibrotic and infected, resulting in serious

and permanent injury;

    d.  The propensity of the mesh design characteristics of the Product for plastic

deformation when subjected to tension both during implantation and once implanted inside the

body which causes the mesh, or portions thereof, to be encapsulated in a rigid scar plate which

leads to nerve entrapment, bacterial entrapment, tissue destruction, enhanced inflammatory and

fibrotic response and chronic pain;

    e.  The propensity of the Product to become rigid and inflexible, causing it to

be improperly mated to the delicate and sensitive areas of the vagina and pelvis where they are

implanted, and causing discomfort and pain with normal daily activities that involve movement

in the pelvic region (e.g., intercourse, defecation, walking);

    f.  The propensity of the Product for degradation or fragmentation over time,

which causes an increased surface area that leads to enhanced chronic inflammatory and fibrotic

reaction, causes a "barbed wire" or "saw blade" effect by the fragmented surface "sawing"

through the tissue, leads to bacteria harboring in the fragmented, peeled and split fiber surface

which in turn leads to chronic infections at the mesh surface, and results in continuing injury over time; and

g.      The inability of surgeons to effectively treat many of these conditions due to the integration of the mesh into the pelvic tissue and thus the inability to safely remove or excise the mesh once a complication occurs;

52.     The Product is also defective due to Defendants' failure to adequately warn or instruct Colleen Major, deceased and/or her health care providers of subjects including, but not limited to, the following:

a.      The Product's propensities to contract, retract, and/or shrink inside the body;

b.      The Product's propensities for degradation, fragmentation and/or migration;

c.      The Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.      The frequency and manner of transvaginal mesh erosion or extrusion;

e.      The risk of chronic inflammation resulting from the Product;

f.      The risk of chronic infections resulting from the Product;

g.      The risk of permanent vaginal or pelvic scarring as a result of the Product;

h.      The risk of de novo urinary dysfunction;

i.      The risk of de novo dyspareunia or painful sexual relations;

j.      The risk of recurrent, intractable pelvic pain and other pain resulting from the Product;

k.      The need for corrective or revision surgery to adjust or remove the Product which in some cases is not feasible nor possible;

l.      The severity of complications that could arise as a result of implantation of the Product;

m.      The hazards associated with the Products;

n.      The Products' defects described herein;

o.      Treatment of stress urinary incontinence with the Product is no more effective than feasible, available and safer alternatives;

p.      Treatment of stress urinary incontinence with the Product exposes patients to greater risk than feasible, available and safer alternatives;

q.      Treatment of stress urinary incontinence with the Product makes future surgical repair more difficult than feasible, available and safer alternatives;

r.      Use of the Product puts the patient at greater risk of requiring additional surgery than feasible, available and safer alternatives;

s.      Removal of the Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

t.      Complete removal of the Product may not be possible and may not result in complete resolution of the complications, including pain.

53.     Defendants under reported and continue to underreport information about the propensity of the Products to fail and cause injury and complications, and have made unfounded representations regarding the efficacy and safety of the pelvic mesh products, including Product, through various means and media.

- 16 -

54. Defendants failed to perform proper and adequate testing and research in order to determine and evaluate the nature, magnitude and frequency of the risks attendant to the Product.

55. Defendant(s) failed to design and establish a safe, effective procedure for removal of the Product, or to determine if a safe, effective procedure for removal of the Product exists.

56. Feasible, suitable and safer alternatives to the Products have existed at all times relevant that do not present the same frequency or severity of risks as do the Product.

57. The Products were at all times utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physician.

58. Defendants knowingly provided incomplete and insufficient training and information to physicians regarding the use of the Products and the aftercare of patients implanted with the Products.

59. The Product implanted in Colleen Major, deceased, was in the same or substantially similar condition as it was when it left Defendants' possession, and in the condition directed by and expected by Defendants.

60. The injuries, conditions, and complications suffered by numerous women around the world who have been implanted with the Product (and other similar pelvic mesh products) include, but are not limited to, erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, chronic pelvic pain, emotional distress and mental anguish, and other debilitating complications.

61. As a result of these life-altering and, in some cases, permanent injuries, many women, including Colleen Major, deceased, have suffered severe emotional pain and injury and has suffered apprehension of increased risk for injuries, infections, pain, mental anguish, discharge, and corrective surgeries as a result of implantation of mesh.

62. The kinds of injuries suffered by Colleen Major are reported in the FDA Safety Communication and in the ACOG/AUGS Joint Committee Opinion.

63. Many women, including Colleen Major, deceased, have been forced to undergo extensive medical treatment including, but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

64. The medical and scientific literature studying the effects of the Product (and other similar pelvic mesh products) has examined each of these injuries, conditions, and complications, and has reported that they are causally related to pelvic mesh products, including the Product.

65. Removal of contracted, eroded and/or infected transvaginal mesh can require multiple surgical interventions for removal of mesh and results in scarring on fragile compromised pelvic tissue and muscles.

66. At all relevant times herein, Defendants continued to promote the Product and other similar pelvic mesh products as safe and effective even when no clinical trials had been done supporting long- or short-term efficacy or safety.

67. In doing so, Defendants failed to disclose the known risks and failed to warn of known or scientifically knowable dangers and risks associated with the Product, including the magnitude and frequency of these risks.

68. At all relevant times herein, Defendants failed to provide sufficient warnings and instructions that would have put Colleen Major, deceased and the general public on notice of the dangers and adverse effects caused by implantation of the Product.

69. The Product as designed, manufactured, distributed, sold and/or supplied by Defendants was defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendants' knowledge of lack of safety.

70. At all times herein mentioned, the officers and directors of Defendants participated in, authorized and directed the production and promotion of the Product when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of the Product and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Colleen Major, deceased.

71. The Product was promoted by Defendants as safe and effective treatment for female urinary incontinence that could be installed by urologists in their patients quickly and on an outpatient basis. Colleen Major, deceased, and/or her physicians relied on Defendants' promises of safety. The Product that Colleen Major, deceased, received, however, was not a safe device, but a device known by Defendants to cause serious internal injuries.

72. Colleen Major, deceased, was implanted with the Product on December 27, 2006, which was designed, manufactured, packaged, labeled, distributed and sold by Defendants.

73. The Product was intended to treat Colleen Major, deceased, for stress urinary incontinence, the use for which Defendants marketed the product.

74.     Colleen Major's treating physicians implanted the Product properly and appropriately.

75.     After, and as a result of the implantation of the Product, Colleen Major, deceased, suffered severe and permanent bodily injuries and significant mental and physical pain and suffering, and economic losses.

76.     After, and as a result of the implantation of the Product in his wife's body, Plaintiff, Jerome Major, suffered loss of consortium, loss of services, and other harms arising from Colleen Major's injuries.

77.     At all times material hereto, Defendants failed to comply or properly comply with state and Federal law in connection with the Product.

78.     The risk of serious injuries was known or should have been known to Defendants, but in spite of these risks, Defendants continued to market the Product to physicians and patients without adequate warnings.

79.     Had Defendants properly disclosed the risks associated with the Product, Colleen Major, deceased, would not have used it.

80.     The injuries suffered by Colleen Major, deceased, and Jerome Major, individually, were caused by the wrongful acts, omissions, and fraudulent representations of Defendants.

81.     As alleged herein, as a direct and proximate result of Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the Product, Colleen Major, deceased, suffered severe and permanent physical injuries.  Colleen Major, deceased, endured substantial pain and suffering prior to her death due to the Product. Colleen Major, deceased, and her Estate have incurred significant expenses for medical care and

- 20 -

treatment.  Colleen Major, deceased, and her Estate suffered economic loss.  Plaintiff, individually, suffered loss of consortium, loss of services, and other injuries as a result of the physical injuries suffered by his deceased wife, Colleen Major, due to Defendants' wrongful conduct as described herein.  Plaintiff seeks actual and punitive damages from Defendants as alleged herein.

<u>**COUNT I**</u>
<u>**Survival Claim:  Negligence**</u>

82.     Plaintiff incorporates by reference paragraphs 1-81 above as if fully set forth herein and further allege as follows:

83.     Defendants had a duty to exercise reasonable care in the design, formulation, manufacture, labeling, sale and/or distribution of the Product, including the duty to assure that the Product did not cause users to suffer from unreasonable, dangerous side effects and symptoms.

84.     Defendants, at all relevant times, knew or, in the exercise of reasonable care, should have known that the Product was of such a nature that it was not properly designed, manufactured, labeled, tested, distributed, advertised, marketed, promoted and/or sold with the proper warnings, and was unreasonably likely to injure the Product's users.

85.     Defendants so negligently and carelessly designed, manufactured, labeled, tested, examined, distributed, advertised, marketed, promoted, sold and/or supplied the Product that it was dangerous and unsafe for the uses and purposes for which it was intended.

86.     Defendants were aware of the probable consequences of the Product.

87.     Defendants knew or should have known the Product would cause serious injury; however, they failed to disclose the known or knowable risks associated with the Product.

1587387.4

88.     Defendants willfully and deliberately failed to avoid those consequences and in doing so, they acted in conscious disregard of the safety of the Colleen Major, deceased.

89.     Defendants owed a duty to Colleen Major, deceased, to adequately warn her and her treating physicians of the risks associated with the Product and the resulting harm and risk it would cause patients.

90.     Defendants breached their duty by failing to comply with state and federal regulations concerning the study, testing, design, development, manufacture, inspection production, advertisement, marketing, promotion, distribution, and/or sale of the Product.

91.     As a direct and proximate result of Defendants' breach, the Product used to treat Colleen Major's female urinary incontinence failed, resulting in her suffering serious injury, pain and harm.

92.     As result of the foregoing acts and omissions, Colleen Major, deceased, suffered severe and permanent physical injuries.  She endured substantial pain and suffering.  She and her Estate incurred significant expenses for medical care and treatment.  Colleen Major, deceased, and her Estate suffered economic loss.  Her injuries and damages are permanent.  Plaintiff seeks actual and punitive damages from Defendants as alleged herein.

93.     Defendants' conduct in continuing to market, sell and distribute the Product after obtaining knowledge that it was failing and not performing as represented and intended showed complete indifference to or a conscious disregard for the safety of others justifying an award of additional punitive damages in such a sum as would serve to punish Defendants and to deter others from similar conduct in the future.

94.     As a direct and proximate result of one or more of Defendants' foregoing deliberate, careless and negligent acts and/or omissions, Colleen Major was injured and suffered

damages of a personal and pecuniary nature, including pain and suffering, prior to her death, damages for which had she survived she would have been entitled to maintain an action; and such an action has survived her and accrued to the benefit of her estate.

95.     Plaintiff brings this claim under 755 ILCS 5/27-6, commonly known as the Survival Act of Illinois.

WHEREFORE, Plaintiff prays for judgment in Count I against Defendants for damages in excess of Seventy-Five Thousand One Dollars ($75,001.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

## COUNT II
### Survival Claim: Strict Product Liability – Defective Design

96.     Plaintiff incorporates by reference paragraphs 1-81 above as if fully set forth herein and further allege as follows.

97.     At all times relevant herein, Defendants were responsible for designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling the Product.

98.     The Product is defective in its design or formulation in that it is not reasonably fit, suitable, or safe for its intended purposes and/or its foreseeable risks exceed the benefits associated with its design.

99.     At all times relevant herein, the Product was expected to reach, and in fact did reach, consumers in the State of Illinois and throughout the United States without substantial change in the condition in which it was sold.

100.    At all times relevant herein, Defendants intended for their Product to be surgically implanted into members of the general public, including Colleen Major, deceased, and knew or

- 23 -

should have known that the Product would be surgically implanted into members of the general public, including Colleen Major, deceased.

101.    The implantation of the Product into Colleen Major, deceased, was reasonably foreseeable and it was used in the manner for which it was intended by the Defendants.

102.    At all times relevant herein, the Product was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following:

a.    When placed in the stream of commerce, the Product contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting individuals, including Colleen Major, deceased, to risks that exceeded the benefit of the Product, including but not limited to the risks of developing serious and dangerous side effects, serious infection, the need for additional procedures to remove and replace the Product, and/or the need for additional surgery as well as other severe and permanent health consequences;

b.    When placed in the stream of commerce, the Product was defective in design, making the use of the Product more dangerous than an ordinary consumer would expect, and more dangerous than other risks associated with alternatives;

c.    The Product's design defects existed before it left the control of Defendants;

d.    The Product was insufficiently tested;

e.    The Product caused harmful side effects that outweighed any potential utility; and

f.     The Product was not accompanied by adequate instruction and/or warnings to fully apprise consumers, including Colleen Major, deceased, herein, of the full nature and extent of the risks and side effects associated with their use, thereby rendering Defendants liable to Plaintiff.

103.     In addition, at the time the Product left the control of the Defendants, there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk of Colleen Major's injuries without impairing the reasonably anticipated or intended function of the Product. These safer alternative designs were economically and technologically feasible, and would have prevented or significantly reduced the risk of Colleen Major's injuries without substantially impairing the Product's utility.

104.     As a direct and proximate result of the foregoing acts and omissions, Colleen Major, deceased, suffered severe and permanent physical injuries. She endured substantial pain and suffering. She and her Estate have incurred significant expenses for medical care and treatment. Colleen Major, deceased, and her Estate have suffered economic loss. Her injuries and damages are permanent. Plaintiff seeks actual and punitive damages from Defendants as alleged herein.

WHEREFORE, Plaintiff prays for judgment in Count II against Defendants for damages in excess of Seventy-Five Thousand One Dollars ($75,001.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

### COUNT III
### Survival Claim: Strict Product Liability – Manufacturing Defect

105.     Plaintiff incorporates by reference paragraphs 1-81 above as if fully set forth herein and further allege as follows.

106.    At all times relevant herein, the Defendants were engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling the Product.

107.    At all times relevant herein, the Product was expected to reach, and did reach, consumers in the State of Illinois and throughout the United States without substantial change in the condition in which it was sold.

108.    The implantation of the Product into Colleen Major, deceased, was reasonably foreseeable and it was used in the manner for which it was intended by the Defendants.

109.    At all times relevant herein, the Product was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a defective and unreasonably dangerous condition at the time they were placed in the stream of commerce in ways which include, but are not limited to, one or more of the following:

a.    When placed in the stream of commerce, the Product contained manufacturing defects which rendered the product unreasonably dangerous and subjected Colleen Major, deceased, to risks that exceeded the benefit of the Product, including but not limited to the risks of developing serious and dangerous side effects, serious infection, the need for additional procedures to remove and replace the Product, and/or the need for additional surgery as well as other severe and permanent health consequences;

b.    The Product's manufacturing defects occurred while the product was in the possession and control of the Defendants;

c.    The Product was not made in accordance with Defendants' specifications or performance standards; and

d.    The Product's manufacturing defects existed before it left the control of Defendants.

110.    As a direct and proximate result of the foregoing acts and omissions, Colleen Major, deceased, suffered severe and permanent physical injuries. She endured substantial pain and suffering.  She and her Estate incurred significant expenses for medical care and treatment. Colleen Major, deceased, and her Estate suffered economic loss.  Her injuries and damages are permanent.  Plaintiff seeks actual and punitive damages from Defendant as alleged herein.

111.    As a direct and proximate result of one or more of Defendants' foregoing deliberate, careless and negligent acts and/or omissions, Colleen Major was injured and suffered damages of a personal and pecuniary nature, including pain and suffering, prior to her death, damages for which had she survived she would have been entitled to maintain an action; and such an action has survived her and accrued to the benefit of her estate.

112.    Plaintiff brings this claim under 755 ILCS 5/27-6, commonly known as the Survival Act of Illinois.

WHEREFORE, Plaintiff prays for judgment in Count III against Defendants for damages in excess of Seventy-Five Thousand One Dollars ($75,001.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

### COUNT IV
### Survival Claim: Strict Product Liability – Failure to Warn

113.    Plaintiff incorporates by reference paragraphs 1-81 above as if fully set forth herein and further allege as follows.

114.    The Product was defective and unreasonably dangerous when it left the possession of Defendants in that it contained warnings insufficient to alert consumers, including

Colleen Major, deceased, herein, of the dangerous risks and reactions associated with the Product including but not limited to its propensity to cause injury, subjecting Colleen Major, deceased, to risks that exceed the benefit of the Product, including but not limited to the risks of developing serious and dangerous side effects, including pelvic pain and dyspareunia, serious infection, the need for additional procedures to remove and replace the Product and/or the need for additional surgery as well as other severe and permanent health consequences, notwithstanding Defendants' knowledge of an increased risk of these injuries and side effects over other forms of treatment for female urinary incontinence.

115.    At all times relevant herein, Defendants were engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling the Product.

116.    At all times relevant herein, Defendants intended for the Product to be surgically implanted into members of the general public, including Colleen Major, deceased, and knew or should have known that the products would be surgically implanted into members of the general public, including Colleen Major, deceased.

117.    Placement of the Product into Colleen Major, deceased, was reasonably foreseeable and it was used in the manner for which it was intended by Defendants.

118.    Colleen Major, deceased, could not, by the exercise of reasonable care, have discovered the defects herein mentioned and perceived their danger.

119.    Defendants, as manufacturers, designers, distributors, and/or sellers of the Product are held to the level of knowledge of experts in the field.

120.    Colleen Major, deceased, individually and through her physicians, reasonably relied upon the skill, superior knowledge and judgment of Defendants.

121.    The warnings that were given by Defendants were not accurate, clear and/or were ambiguous.

122.    The warnings that were given by Defendants failed to properly warn physicians of the increased risks associated with the Product, subjecting Colleen Major, deceased, to risks that exceeded the benefit of the product, including but not limited to the risks of developing serious and dangerous side effects, serious infection, the need for additional procedures to remove and replace the Product and/or the need for additional surgery as well as other severe and permanent health consequences.

123.    Defendants had a duty to warn Colleen Major, deceased, of the dangers associated with the Product.

124.    Had Colleen Major, deceased, received adequate warnings regarding the risks of the Product, she would not have used it.

125.    As a direct and proximate result of the foregoing acts and omissions, Colleen Major, deceased, suffered severe and permanent physical injuries.  She endured substantial pain and suffering.  She and her Estate incurred significant expenses for medical care and treatment. Colleen Major, deceased, and her Estate have suffered economic loss.  Her injuries and damages are permanent.  Plaintiff seeks actual and punitive damages from Defendants as alleged herein.

126.    As a direct and proximate result of one or more of Defendants' foregoing deliberate, careless and negligent acts and/or omissions, Colleen Major was injured and suffered damages of a personal and pecuniary nature, including pain and suffering, prior to her death, damages for which had she survived she would have been entitled to maintain an action; and such an action has survived her and accrued to the benefit of her estate.

127.     Plaintiff brings this claim under 755 ILCS 5/27-6, commonly known as the Survival Act of Illinois.

WHEREFORE, Plaintiff prays for judgment in Count IV against Defendants for damages in excess of Seventy-Five Thousand One Dollars ($75,001.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

### COUNT V
### Survival Claim: Breach Of Implied Warranties

128.     Plaintiff incorporates by reference paragraphs 1-81 above as if fully set forth herein and further allege as follows.

129.     Defendants designed, manufactured, marketed, distributed, supplied and sold the Product for the treatment of female urinary incontinence.

130.     Defendants sold the Product which was implanted into Colleen Major, deceased, and prior to its implantation, Defendants impliedly warranted to Colleen Major, deceased, and to her physicians and health care providers, that the product was of merchantable quality and safe and fit for the uses for which it was intended.

131.     Colleen Major, deceased, and her physicians and health care providers reasonably relied on Defendants' judgment, statements and indications that the Product was fit for such uses.

132.     At the time of the sale of the Product, Defendants knew, or should have known, that the Product's intended uses were to be surgically implanted into the body for the treatment of female urinary incontinence.

133.     At the time of Colleen Major's receipt and/or use of the Product, the Product was being used for the purposes and in a manner normally intended, namely for the treatment of female urinary incontinence.

1587387.4

134.    Due to Defendants' wrongful conduct as alleged herein, Colleen Major, deceased, could not have known about the nature of the risks and side effects associated with the Product until after it was implanted in Colleen Major, deceased.

135.    When the Product was distributed into the stream of commerce and sold by Defendants, it was unsafe for its intended uses, and not of merchantable quality, as warranted by Defendants in that it had very dangerous propensities when used as intended and implanted into a patient's body where it could cause serious injury or harm or death to the end user.

136.    As a direct and proximate result of the foregoing acts and omissions, Colleen Major, deceased, suffered severe and permanent physical injuries. She endured substantial pain and suffering. She and her Estate incurred significant expenses for medical care and treatment. Colleen Major, deceased, and her Estate suffered economic loss.  Her injuries and damages are permanent.  Plaintiff seeks actual and punitive damages from Defendants as alleged herein.

137.    As a direct and proximate result of one or more of Defendants' foregoing deliberate, careless and negligent acts and/or omissions, Colleen Major was injured and suffered damages of a personal and pecuniary nature, including pain and suffering, prior to her death, damages for which had she survived she would have been entitled to maintain an action; and such an action has survived her and accrued to the benefit of her estate.

138.    Plaintiff brings this claim under 755 ILCS 5/27-6, commonly known as the Survival Act of Illinois.

WHEREFORE, Plaintiff prays for judgment in Count V against Defendants for damages in excess of Seventy-Five Thousand One Dollars ($75,001.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

1587387.4

## COUNT VI
### Survival Claim: Breach of Express Warranties

139.    Plaintiff incorporates by reference paragraphs 1-81 above as if fully set forth herein and further allege as follows.

140.    Defendants expressly warranted and/or represented to physicians and healthcare providers that the Product was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects, and that it was adequately tested and fit for its intended uses.

141.    Members of the medical community, including physicians and other healthcare professionals, relied upon the representations and warranties of Defendants for use of the Product.

142.    Colleen Major, deceased, did so rely on the express warranties of Defendants herein.

143.    The Product does not conform to the express representations because the Product is not safe and has numerous serious risks and side effects.

144.    Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue in that the Product was not safe and fit for the uses intended, and, in fact, produced serious injuries to the users.

145.    As a result of the foregoing acts and/or omissions, Colleen Major, deceased, was caused to suffer and/or at a great risk of suffering serious and dangerous side effects including but not limited to serious infection, the need for additional procedures to remove and replace the Product and/or the need for surgery as well as other severe and permanent health consequences.

146.    As a direct and proximate result of the foregoing acts and omissions, Colleen Major, deceased, suffered severe and permanent physical injuries.  She endured substantial pain

and suffering. She and her Estate incurred significant expenses for medical care and treatment. Colleen Major, deceased, and her Estate has suffered economic loss. Her injuries and damages are permanent. Plaintiff seeks actual and punitive damages from Defendants as alleged herein.

147. As a direct and proximate result of one or more of Defendants' foregoing deliberate, careless and negligent acts and/or omissions, Colleen Major was injured and suffered damages of a personal and pecuniary nature, including pain and suffering, prior to her death, damages for which had she survived she would have been entitled to maintain an action; and such an action has survived her and accrued to the benefit of her estate.

148. Plaintiff brings this claim under 755 ILCS 5/27-6, commonly known as the Survival Act of Illinois.

WHEREFORE, Plaintiff prays for judgment in Count VI against Defendants for damages in excess of Seventy-Five Thousand One Dollars ($75,001.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

## COUNT VII
## Survival Claim: Fraudulent Misrepresentation

149. Plaintiff incorporates by reference paragraphs 1-81 above as if fully set forth herein and further allege as follows.

150. Defendants falsely and fraudulently represented to the medical and healthcare community, and to Plaintiffs and the general public, that the Product had been tested and was found to be safe and/or effective for the treatment of female urinary incontinence.

151. The representations made by Defendants were, in fact, false.

1587387.4

152.     When said representations were made by Defendants, they knew those representations to be false and they willfully, wantonly and recklessly disregarded whether the representations were true.

153.     These representations were made by Defendants with the intent of defrauding and deceiving Colleen Major, deceased, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community, to recommend, prescribe, dispense and/or purchase the Product for the treatment of female urinary incontinence, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Colleen Major, deceased, and the general public.

154.     At the time the aforesaid representations were made by Defendants and, at the time Colleen Major, deceased, was treated with the Product, Colleen Major, deceased, was unaware of the falsity of said representations and reasonably believed them to be true.

155.     In reliance upon said representation, Colleen Major, deceased, was induced to and did use the Product, thereby sustaining severe and permanent personal injuries, including but not limited to serious infection, the need for additional procedures to remove the Product, as well as other severe and permanent health consequences.

156.     Defendants knew and were aware or should have been aware that the Product had not been sufficiently tested, were defective in nature, and/or that they lacked adequate and/or sufficient warnings

157.     Defendants knew or should have known that the Product had the potential to, could, and would cause severe and grievous injury to the users of said product, and that they

were inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings.

158.    Defendants brought the Product to the market, and acted fraudulently, wantonly and maliciously to the detriment of the Colleen Major, deceased.

159.    As a direct and proximate result of the foregoing acts and omissions, Colleen Major, deceased, suffered severe and permanent physical injuries. She endured substantial pain and suffering.  She and her Estate incurred significant expenses for medical care and treatment. Colleen Major, deceased, and her Estate suffered economic loss.  Her injuries and damages are permanent.  Plaintiffs seek actual and punitive damages from Defendants as alleged herein.

160.    As a direct and proximate result of one or more of Defendants' foregoing deliberate, careless and negligent acts and/or omissions, Colleen Major was injured and suffered damages of a personal and pecuniary nature, including pain and suffering, prior to her death, damages for which had she survived she would have been entitled to maintain an action; and such an action has survived her and accrued to the benefit of her estate.

161.    Plaintiff brings this claim under 755 ILCS 5/27-6, commonly known as the Survival Act of Illinois.

WHEREFORE, Plaintiff prays for judgment in Count VII against Defendants for damages in excess of Seventy-Five Thousand One Dollars ($75,001.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

## COUNT VIII
### Survival Claim: Negligent Misrepresentation

162.    Plaintiff incorporates by reference paragraphs 1-81 above as if fully set forth herein and further allege as follows.

163.     Defendants had a duty to represent to the medical and healthcare community, and to Colleen Major, deceased, and the general public that the Product had been tested and found to be safe and effective for the treatment of female urinary incontinence.

164.     The representations made by Defendants were, in fact, false.

165.     Defendant failed to exercise ordinary care in the representation of the Product, while involved in their manufacture, sale, testing, quality assurance, quality control, and/or distribution of said product into interstate commerce in that Defendants negligently misrepresented the Product's high risk of unreasonable, dangerous side effects including, but not limited to, the risk of developing serious infection and permanent scarring.

166.     Defendants breached their duty in misrepresenting the Product's serious side effects to the medical and healthcare community, to the Colleen Major, deceased, and the public in general.

167.     As a direct and proximate result of the foregoing acts and omissions, Colleen Major, deceased, suffered severe and permanent physical injuries.  She endured substantial pain and suffering.  She and her Estate incurred significant expenses for medical care and treatment.  Colleen Major, deceased, and her estate suffered economic loss.  Her injuries and damages are permanent.  Plaintiff seeks actual and punitive damages from Defendants as alleged herein.

168.     As a direct and proximate result of one or more of Defendants' foregoing deliberate, careless and negligent acts and/or omissions, Colleen Major was injured and suffered damages of a personal and pecuniary nature, including pain and suffering, prior to her death, damages for which had she survived she would have been entitled to maintain an action; and such an action has survived her and accrued to the benefit of her estate.

169. Plaintiff brings this claim under 755 ILCS 5/27-6, commonly known as the Survival Act of Illinois.

WHEREFORE, Plaintiff prays for judgment in Count VIII against Defendants for damages in excess of Seventy-Five Thousand One Dollars ($75,001.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

**COUNT IX**
**Survival Claim: Violation Of Illinois Consumer Fraud And
Deceptive Business Practices Act Claim**

Plaintiff incorporates by reference paragraphs 1-81 above as if fully set forth herein.

170. At all times pertinent hereto, Colleen Major, deceased, was a "consumer" and "person" as those terms are defined in the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Consumer Fraud Act") 815 ILCS 505/1.

171. At all times pertinent hereto, Defendants were engaged in providing "advertisements" and "merchandise" in "trade" and "commerce" as those terms are defined in the Consumer Fraud Act, 815 ILCS 505/1.

172. Defendants (a) engaged in unfair and deceptive acts and practices by providing unfair, false, deceptive, and unconscionable representations and statements in its label, advertisements, telemarketing, public relations and other promotional materials, as outlined in this Complaint; (b) with the intent on Defendants' part that Colleen Major and other consumers would rely on this deception; and (c) which all occurred in a course of conduct involving trade and commerce.

173. As set forth above, Defendants have known that the Product carried a high risk of injury and failed to warn of the risk. Defendants failed to include language in their label of the risks.

174.     Despite its clear knowledge of the risks of injury, Defendants have allowed an affirmative misrepresentation to exist in the label that there is no risk or very little risk.  This is false and misleading and resulted in injuries to Colleen Major, deceased.

175.     Defendants failed to ensure that the content of its label was/is true and correct and adequately warns the medical community and consuming public of the Product's risks.

176.     The above and foregoing unfair and deceptive acts and practices constitute violations of the Consumer Fraud Act, 815 ILCS 505/2.

177.     As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Colleen Major, deceased, and the public were deceived.

178.     Plaintiff is entitled to damages and other statutory relief provided in the Act including but not limited to, appropriate injunctive and equitable relief.

179.     The policies, acts and practices alleged herein were substantial, were not outweighed by any countervailing benefits to Colleen Major, deceased, and caused damages to her that could have been avoided. Such conduct is unethical, unscrupulous and against public policy.

180.     The above-described unfair and unconscionable acts and practices conducted by Defendants continue to this day and will likely result in damages in the future.

181.     As a result of the conduct described herein, Defendants have been unjustly enriched at Colleen Major's expense.

182.     Plaintiff seeks an order of this court declaring such deceptive acts and practices to be a violation of the Act, requiring Defendants to immediately cease such unfair methods of competition and enjoining Defendants from continuing to conduct business via the unfair and unconscionable acts and practices as complained herein.  Plaintiff additionally requests an order

- 38 -

disgorging Defendants' ill-gotten gains and awarding Plaintiff full damages, plus attorney's fees and costs.

183.    As a direct and proximate result of one or more of Defendants' foregoing deliberate, careless and negligent acts and/or omissions, Colleen Major was injured and suffered damages of a personal and pecuniary nature, including pain and suffering, prior to her death, damages for which had she survived she would have been entitled to maintain an action; and such an action has survived her and accrued to the benefit of her estate.

184.    Plaintiff brings this claim under 755 ILCS 5/27-6, commonly known as the Survival Act of Illinois.

WHEREFORE, Plaintiff respectfully requests that he be awarded her actual economic damages exceeding the minimum jurisdictional amount in the Circuit Court of Lake County, Illinois Law Division, her attorney's fees and costs and for injunctive relief in the form of an order a) declaring Defendants' conduct to be deceptive and a violation of the Consumer Fraud Act; b) directing Defendants to cease and desist from engaging in such unfair and deceptive conduct; c) enjoining Defendants from further violations of the Consumer Fraud Act; d) directing Defendants to include in its Product label data showing the increased rate of injury or be enjoined from receiving royalties from sales and from the manufacture, production, promotion, distribution and marketing of the Product for distribution, sale, and use by the general public.

## COUNT X
### Discovery Rule, Equitable Tolling, and Fraudulent Concealment

185.    Plaintiff incorporates by reference all paragraphs above as if fully set forth herein.

1587387.4

186.     Plaintiff asserts all applicable statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, class action tolling, delayed discovery, discovery rule, and fraudulent concealment.

187.     Despite diligent investigation by Plaintiff into the cause their injuries, including consultations with medical providers, the nature of the injuries and damages, and their relationship to Defendants' wrongful conduct with respect to the Product was not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.  Therefore, Plaintiff's suit was filed well within the applicable statutory limitations period.

188.     The running of the statute of limitations in this cause is tolled due to equitable tolling.  Defendants are estopped from asserting a statute of limitations defense due to Defendants' fraudulent concealment, through affirmative misrepresentations and omissions, from Plaintiff and Plaintiff's physicians of the true risks associated with the Product.  As a result of Defendants' fraudulent concealment, Plaintiffs and Plaintiffs' physicians were unaware, and could not have known or have learned through reasonable diligence that Plaintiffs had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendants.

## COUNT XI
### Loss Of Consortium

189.     Plaintiff incorporates by reference all paragraphs above as if fully set forth herein.

190.     These allegations for loss of consortium are made against all Defendants.

191.     Before decedent's death, Plaintiff was cohabitating with decedent, his wife, and Plaintiff was enjoying decedent's companionship and care.

192.    As a direct and proximate result of the one or more of the aforesaid wrongful acts or omissions of the Defendants, Plaintiff:

a.    has been suffered a loss of consortium and has been deprived of the loss of love, affection, services, companionship, society and relationship of decedent from the time of her injury; and

b.    has been hindered and prevented from transacting and attending to his usual business and personal affairs.

WHEREFORE, Plaintiff prays for judgment in Count VIII against Defendants for damages in excess of Seventy-Five Thousand One Dollars ($75,001.00), which is fair and reasonable, costs herein expended, punitive damages to punish and deter any such conduct in the future and such other relief as the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial.

1587387.4

Dated:  July 24, 2018                              Respectfully submitted,


                                                  */s/ Amy E. Keller*
                                                  _____
                                                  Adam J. Levitt
                                                  Amy E. Keller
                                                  **DiCELLO LEVITT & CASEY LLC**
                                                  Ten North Dearborn Street
                                                  Eleventh Floor
                                                  Chicago, Illinois 60602
                                                  Telephone:  (312) 214-7900
                                                  alevitt@dlcfirm.com
                                                  akeller@dlcfirm.com

                                                  Wendy R. Fleishman (*Pro Hac Vice* to be
                                                  submitted)
                                                  **LIEFF CABRASER HEIMANN &**
                                                  **BERNSTEIN, LLP**
                                                  250 Hudson Street, 8th Floor
                                                  New York, NY  10013-1413
                                                  Telephone:  (212) 355-9500
                                                  Facsimile:   (212) 355-9592
                                                  wfleishman@lchb.com

                                                  Sarah R. London (*Pro Hac Vice* pending)
                                                  **LIEFF CABRASER HEIMANN &**
                                                  **BERNSTEIN, LLP**
                                                  275 Battery Street, 29th Floor
                                                  San Francisco, CA  94111-3339
                                                  Telephone:  (415) 956-1000
                                                  Facsimile:   (415) 956-1008
                                                  slondon@lchb.com

                                                  *Attorneys for Plaintiff*

1587387.4